UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

THE UNITED STATES FOR THE USE AND BENEFIT      Case # 07 civ. 3318 (CLB)(LMS)
OF PLATINUM MECHANICAL, LLC,

Plaintiff,

-against-

UNITED STATES SURETY COMPANY,
US SPECIALTY INSURANCE COMPANY and

CFP GROUP, INC.

Defendants.

CFP GROUP, INC.,

-against-

UTICA MUTUAL INSURANCE COMPANY.

Additional Defendant on the Counterclaim

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UTICA MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

MOUND COTTON WOLLAN & GREENGRASS
One Battery Park Plaza
New York, New York 10004
(212) 804-4200

Attorneys for Additional Defendant on the Counterclaim
Utica Mutual Insurance Company

Of Counsel:
    John Mezzacappa

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...................................................................................1

STATEMENT OF FACTS......................................................................................1

ARGUMENT.......................................................................................................2

POINT I

    THE PERFORMANCE BOND AND PAYMENT BOND
    ARE   GOVERNED BY PRINCIPLES OF CONTRACT
    INTERPRETATION.......................................................................................2

POINT II

    THE NOTICE PROVISIONS OF THE PERFORMANCE
    BOND ARE CONDITIONS PRECEDENT TO THE
    SURETY'S OBLIGATIONS............................................................................2

POINT III

    CFP DID NOT COMPLY STRICTLY WITH THE NOTICE
    PROVISIONS OF THE PERFORMANCE BOND.......................................8

POINT IV

    UTICA MUTUAL'S OBLIGATIONS DID NOT ARISE
    UNDER THE PERFORMANCE BOND.......................................................9

POINT V

    CFP HAS NO PRESENT CLAIM AGAINST UTICA MUTUAL
    UNDER THE PAYMENT BOND................................................................10

SUMMARY JUDGMENT IS APPROPRIATE......................................................12

CONCLUSION..................................................................................................14

## TABLE OF AUTHORITIES

**Case**                                                                          **Page**

120 Greenwich Dev. Assoc. LLC v. Reliance Ins. Co.,
    01 Civ. 8219 (PKL), 2004 U.S. Dist. LEXIS 10514, (S.D.N.Y., 2004)..............*passim*

Balfour Beatty Constr. Inc. v. Colonial Ornamental Iron Works Inc.,
    986 F. Supp. 82, 86 (D. Conn. 1997)....................................................................8

Bank of Brewton Inc. v. Int'l Fid. Ins. Co.,
    827 So. 2d 747, 753 (Ala. 2002)..................................................................7,10

Celotex Corp. v. Catrett,
    477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).........................12

Elm Haven Constr.  Ltd. P'ship v. Neri Constr. LLC. et al.,
    376 F.3d 96, 100 (2d Cir. 2004).............................................................*passim*

Enter. Capital, Inc. v. San-gra Corp et al.,
    284 F. Supp. 2d 166, 179-181 (D. Mass. 2003)..........................................7,10

Israel v. Chabra,
    04 Civ. 4599 (DC), 04 Civ. 5859 (DC), 2006 U.S. Dist. LEXIS 11613,
    at *4 (S.D.N.Y. March 21, 2006)...................................................................4

Natl. Fuel Gas Distrib. Corp. v. Hartford Fire Ins. Co.,
    2003-258, slip op. at 14 (Sup. Ct. N.Y. County Aug. 1, 2005)...................4,13

Nobel Ins. Co. v. City of New York,
    00-CV-1328 (KMK), 2006 U.S. Dist. LEXIS 70816, at *31-37
    (S.D.N.Y. Sept. 29, 2006)..............................................................................4

Omni Quartz, Ltd. v. CVS Corp.,
    287 F.3d 61, 64 (2d Cir. 2002).....................................................................13

Sayers v. Rochester Tel. Corp.,
    7 F.3d 1091, 1094 (2d Cir. 1993)..................................................................12

Seaboard Surety Co. v. Town of Greenfield,
    370 F.3d 215, 216 (1st Cir. 2004)...............................................................7,10

United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,
    369 F.3d 34, 51 (2d Cir. 2004)...............................................................*passim*

**Case**                                                                    **Page**

Walk-In Med. Ctrs. Inc. v. Breuer Capital Corp.,
    818 F.2d 260, 263 (2d Cir. 1987)..................................................................12

Walter Concrete Constr. Corp. v. Lederle Labs. et al.,
    758 N.Y.S. 2d 260, 261 (Ct. App. 2003)......................................................4,5

## PRELIMINARY STATEMENT

This memorandum of law is submitted by Additional Defendant on the Counterclaim, Utica Mutual Insurance Company ("Utica Mutual"), in support of its motion for summary judgment.

CFP Group Inc.'s ("CFP") Amended Counterclaim is without merit because CFP ignored the pre-default notification requirements of Utica Mutual's Performance Bond and thereby deprived Utica Mutual of its right to 1) investigate in advance of default, 2) cure any default or, 3) at a minimum control the expense of any steps taken to cure any default. Because of CFP's blatant breach, Utica Mutual's rights were prejudiced and CFP is not entitled to the benefit of the Performance Bond. Moreover, there is no present claim by CFP that will stand under Utica Mutual's Payment Bond.

## STATEMENT OF FACTS

Utica Mutual issued its Performance Bond No. SU3950828 and its Payment Bond No. SU3950828 in connection with HVAC work at Stewart Air National Guard Base, Newburgh, New York. (Ryan Aff. at ¶ 4 and Exhibits A and B). The principal and Contractor under the bonds is Platinum Mechanical, LLC ("Platinum"). (Ryan Aff. Exhibits A and B).

The Performance Bond provides:

> 3 If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
>
> 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the

Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(Ryan Aff. Exhibit A)

The Performance Bond further provides:

4 When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

that are prescribed in Paragraph 4 of the Performance Bond.

(Ryan Aff. Exhibit A)
The Surety's address per Paragraph 10 of the Performance Bond is:

Utica Mutual Insurance Company
180 Genesees Street
New Hartford, New York 13413

The owner listed on the Performance Bond, the CFP Group ("CFP"), by letter of March 19, 2007 gave Platinum formal notice that it was in default under the terms of project agreement. (Ryan Aff. Exhibit C). As recounted in the letter of March 28, 2007 from Craig M. Peters, counsel for CFP to Paul Ryan, counsel for Platinum, Platinum was given formal notice of default and its services and contract were terminated by CFP by its letter of March 19, 2007. (Ryan Aff. Exhibit D). Furthermore, Platinum was barred from the job site as of March 12, 2007. (Ryan Aff. Exhibit D).

The first notice of any kind given to Utica Mutual at its address listed in the bond was by letter dated May 2, 2007 stating that Platinum was in default. (Ryan Aff. Exhibit E). CFP did not give pre-default notice to either Platinum or Utica Mutual as required under Paragraphs 3.1 and 3.2 of the Performance Bond prior to giving formal notice of default. (Ryan Aff. ¶ 12). CFP did not "request and attempt to arrange a conference with the Contractor and the Surety...to discuss methods of performing the construction contract" as required under Paragraph 3.1 of the Performance Bond. (Ryan Aff. ¶ 13). CFP did not pay the contract balance to Utica Mutual or to a Contractor selected by Utica Mutual to complete the construction contract as required under Paragraph 3.3 of the Performance Bond. (Ryan Aff. ¶ 14).

The Payment Bond issued by Utica Mutual defines a "claimant" as "an individual or entity having a direct contract with the Contractor [Platinum] or with a subcontractor of the Contractor [Platinum] to furnish labor, materials or equipment for use in the performance of the contract." (Ryan Aff. Exhibit B). CFP is the "Owner" listed in the Payment Bond. (Ryan Aff. Exhibit B). CFP did not have a contract with Platinum nor did it have a contract with a subcontractor of Platinum to furnish labor, materials or equipment for use in the performance of the contract. (Ryan Aff. ¶ 20). Moreover, there is no present claim for defense or indemnity of CFP with respect to any claim asserted by any claimant as defined under the Payment Bond. (Ryan Aff. ¶ 22). Furthermore, no such claimant as defined in the Payment Bond is a party to this litigation.

## ARGUMENT

### POINT I

**THE PERFORMANCE BOND AND PAYMENT BOND ARE GOVERNED
BY PRINCIPLES OF CONTRACT INTERPRETATION**

In New York, it is a well-settled rule that the terms of a surety contract are to be construed in accordance with contractual law. Natl. Fuel Gas Distrib. Corp. v. Hartford Fire Ins. Co., 2003-258, slip op. at 14 (Sup. Ct. N.Y. County Aug. 1, 2005) ("the rule of construction is not changed because the defendant is a surety"); Walter Concrete Constr. Corp. v. Lederle Labs. et al., 758 N.Y.S. 2d 260, 261 (Ct. App. 2003) ("[s]urety bonds--like all contracts--are to be construed in accordance with their terms"); United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir. 2004) ("we look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond"); Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC. et al., 376 F.3d 96, 100 (2d Cir. 2004); Nobel Ins. Co. v. City of New York, 00-CV-1328 (KMK), 2006 U.S. Dist. LEXIS 70816, at *31-37 (S.D.N.Y. Sept. 29, 2006).

The Performance Bond and Payment Bond at issue are surety contracts therefore their terms should be governed by the standard principles of contract interpretation.

### POINT II

**THE NOTICE PROVISIONS OF THE PERFORMANCE BOND ARE CONDITIONS
PRECEDENT TO THE SURETY'S OBLIGATIONS**

New York courts define a condition precedent as "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Israel v. Chabra, 04 Civ. 4599 (DC), 04 Civ. 5859 (DC), 2006 U.S. Dist. LEXIS 11613, at *4 (S.D.N.Y. March 21, 2006); Natl. Fuel, 2003-258, slip op. at 14; United States Fid., 369 F.3d at 51.

The language set forth in Paragraph 3.1 of the Performance Bond creates a condition precedent to Utica Mutual's performance. The Performance Bond states inter alia that "the Surety's obligation under this Bond shall arise after: 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract."

In addition, the Performance Bond that is the subject of this litigation is an AIA-312 bond which requires pre-default notification as a precursor to liability under the bond. Walter Concrete, 758 N.Y.S. 2d at 261 (the AIA 312 "requires predefault notification be given to the contractor and surety by the owner"); United States Fid., 369 F.3d at 41 (held that the provisions of Paragraph 3 of the AIA 312 constitute conditions precedent to the Surety's obligations but found in that case that the conditions precedent had been satisfied); 120 Greenwich Dev. Assoc. LLC v Reliance Ins. Co., 01 Civ. 8219 (PKL), 2004 U.S. Dist. LEXIS 10514, at *34-37 (S.D.N.Y. June 7, 2004).

120 Greenwich Dev. Assoc. LLC v. Reliance Ins. Co., 01 Civ. 8219 (PKL), 2004 U.S. Dist. LEXIS 10514, (S.D.N.Y., 2004) (copy attached as Appendix 1) is on all fours with the case at bar. In 120 Greenwich, like here, the Owner/obligee under the Performance Bond failed to give pre-default notification to the Surety. The Owner/obligee then commenced suit claiming it was entitled to damages for default by the Contractor. The Performance Bond at issue in 120 Greenwich was an AIA Document 312 Performance Bond containing language virtually identical to the bond at issue here. In his decision, Judge Leisure quoted the provisions of Paragraphs 3 and 4 of the Bond and proceeded to grant summary judgment to the Surety on the

specific ground that 120 Greenwich failed to satisfy the conditions precedent contained in Paragraph 3 of the Bond. The court began by holding that the Surety's "argument that the provisions in Paragraph 3 of the Bond are conditions precedent to its obligations under the Bond is a question of law for the court to determine." The court then considered and rejected the obligee's contention that the provisions "do not constitute conditions precedent and that they merely provide Reliance [the Surety] a defense to the extent that it can show prejudice as a result of 120 Greenwich's failure to provide timely notice of TCCI's [the Contractor's] default."

After discussing the law in New York regarding conditions precedent, Judge Leisure concluded:

> Here Paragraph 3 of the Bond clearly states,
>
> The **Surety's** obligation under this bond shall arise after the owner has taken the steps detailed in subparagraphs 3.1-3.3. Specifically, the owner must (1) notify the **Contractor** and the **Surety** that it is considering declaring a default and request a meeting with the **Contractor** to attempt to resolve the problem with the **Contractor's** performance; if the problems are not resolved the owner must then (2) formally declare a **Contractor** default and terminate the **Contractor's** right to complete the contract and (3) pay the balance of the contract price to the **Surety** or to the **Contractor** selected to complete the construction contract. This language creates unambiguous preconditions for triggering Reliance's [the Surety's] obligations under the Bond that apply, not just to the completion options in Paragraph 4, but also to its obligations for delay costs and other damages under Paragraph 6." (citations omitted).
>
> (Appendix 1 page 15 of 16)

As a result Judge Leisure granted the Surety's motion for summary judgment on the ground that the Owner/obligee failed to satisfy the conditions precedent contained in Paragraph 3 of the Bond.[1]

Here, as in 120 Greenwich, Utica Mutual's Bond contains the identical provision found by Judge Leisure to constitute conditions precedent to the Surety's obligations under the Bond. It is undisputed that the Owner/obligee, CFP, did not comply with the pre-default notification requirements. As in 120 Greenwich, therefore, summary judgment in favor of the Surety, Utica Mutual, is mandated. Other jurisdictions have consistently construed the identical language as containing conditions precedent to the surety's obligations. Seaboard Surety Co. v. Town of Greenfield, 370 F.3d 215, 216 (1st Cir. 2004) (Summary judgment upheld in favor of surety where owner complied with Paragraph 3 requirements of AIA 312 Performance Bond but failed to give the additional written notice required by Paragraph 5); Enter. Capital, Inc. v. San-gra Corp et al., 284 F. Supp. 2d 166, 179-181 (D. Mass. 2003) (bonds incorporated declaration and termination procedure of contract held to be conditions precedent to surety's obligation which were not satisfied and therefore warranted summary judgment in favor of surety); Bank of Brewton Inc. v. Int'l Fid. Ins. Co., 827 So. 2d 747, 753 (Ala. 2002) (provisions identical to Paragraph 3 here held to be conditions precedent to surety's obligation and failure to satisfy one or more justified summary judgment in surety's favor). In addition, other courts have interpreted similar language as creating a condition precedent to invoking the surety's obligations. See e.g.

---

[1] Judge Leisure discussed and rejected the earlier, and partially contrary, holding in International Fidelity Ins. Co. v. County of Rockland, et al., 98 F. Supp. 2d 400 (S.D.N.Y. 2000) noting that it was decided prior to United States Fidelity and Guaranty v. Braspetro Oil Services, 219 F. Supp.2d at 477 and Walter Concrete Constr. Group v. Lederle Laboratories, 99 N.Y.2d 603, 605, 758 N.Y.S.2d 260, 261 (2003), and that it dealt with delay damages only. Judge Leisure also included a footnote that on appeal of United States Fidelity and Guaranty v. Braspetro Oil Services, the Second Circuit adopted the district court's determination that the provisions of Paragraph 3 of the AIA 312 form constitute conditions precedent, 369 F.3d 34, 41.

Elm Haven, 376 F.3d at 100-101 (2d Cir. 2004); Balfour Beatty Constr. Inc. v. Colonial Ornamental Iron Works Inc., 986 F. Supp. 82, 86 (D. Conn. 1997).

As discussed above, Paragraph 3.1 of the Performance Bond declares that the surety's obligation shall arise after the Owner, here CFP, gives pre-default notification to the Contractor Platinum Mechanical, LLC ("Platinum") and the Surety, Utica Mutual, and requests a meeting to discuss performance of the Construction Contract at least twenty days prior to declaring that the Contractor is in default. This language in the Performance Bond creates an unambiguous condition precedent to invoking Utica Mutual's obligations under the bond, a condition that CFP failed to satisfy. By reason of this failure, Utica Mutual, like the Surety in 120 Greenwich, is entitled to summary judgment dismissing CFP's claims against it.

## POINT III

### CFP DID NOT COMPLY STRICTLY WITH THE NOTICE PROVISIONS OF THE PERFORMANCE BOND

Pursuant to Paragraph 3.1 of the Performance Bond, CFP, as Owner, was required to notify the Contractor and the Surety that it "[was] considering declaring a Contractor Default" and CFP was also required to "request[] and attempt[] to arrange a conference with the Contractor and Surety . . . to discuss methods of performing the Construction Contract."

CFP did not give pre-default notification to either the Contractor or the Surety. CFP only communicated with the Contractor and the Surety that it declared a Contractor Default. (Ex. B ¶ 1; Ex. C ¶ 1). CFP did not attempt to arrange a conference to discuss methods of performing the Construction Contract. Instead, CFP barred Platinum from the job site and terminated Platinum's services; breaching its obligation to give both the Contractor and the Surety the option to cure the alleged Contractor Default. (Ex. A at 2, ¶ 3).

An obligee bringing an action on a surety bond must show strict compliance with the notice provisions of the bond. 120 Greenwich, 2004 U.S. Dist. LEXIS 10514, at *34; See also United States Fid., 369 F.3d at 41, 61; Elm Haven, 376 F.3d at 98.

CFP did not strictly comply with the notice provisions of the Performance Bond because it did not notify the Contractor and the Surety that it was considering declaring a Contractor Default and CFP did not request a meeting with the Contractor and Surety to discuss methods of performing the Construction Contract.  As a result, Utica Mutual was deprived of its right to investigate and cure any potential default and to control the expense involved in any potential completion and/or remediation work.  By failing to comply with the notice and other provisions of Paragraph 3 of the Performance Bond, CFP blantantly frustrated their purpose and has forfeited its right to claim any benefit under the Performance Bond.

**POINT IV**

**UTICA MUTUAL'S OBLIGATIONS DID NOT
ARISE UNDER THE PERFORMANCE BOND**

The language of the bond clearly provides that "the Surety's obligation under this Bond shall arise after: 3.1 The Owner has notified the Contractor and the Surety" that it "is considering declaring a Contractor Default" and has "requested and attempted to arrange a conference with the Contractor and Surety . . . to discuss methods of performing the Construction Contract." Utica Mutual's obligations, under the Performance Bond it issued, were not properly invoked because CFP did not comply with the notification requirement of the bond.

Under New York law, it is established that a surety's obligations do not arise until the obligee performs his obligations under a bond.  In United States Fid., the Court stated that "before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." Id. at 51; Elm Haven, 376 F.3d at 100.  In 120 Greenwich, the court in

analyzing the identical language, contained in the Performance Bond at issue, concluded that the notice provision was a condition precedent to the surety's liability and because the Owner had not taken the steps detailed in Paragraph 3 the surety's obligations had not been triggered.

In addition, cases from other jurisdictions which address the precise issue being litigated have found that the surety's indemnity obligations under the bond arise after the owner has fulfilled the steps outlined in Paragraph 3.1-3.3. Bank of Brewton, 827 So. 2d at 753; Enter. Capital, 284 F. Supp. 2d at 179; Seaboard, 370 F.3d at 216-217.

**POINT V**

**CFP HAS NO PRESENT CLAIM AGAINST
UTICA MUTUAL UNDER THE PAYMENT BOND**

Utica Mutual also issued its Payment Bond in connection with the project.  Although CFP has made vague allegations relating to the Payment Bond, a review of the bond and the current situation readily shows that there is no present viable claim under the Payment Bond on behalf of CFP.

First, it is clear from the terms of the Payment Bond that its purpose is to assure that the contractor and principal, Platinum, makes payment to its suppliers, laborers, and subcontractors. In its definitions section, the Payment Bond defines "claimant" as "an individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract."  The "Contractor" as shown on the face of the Payment Bond is Platinum.  Obviously, CFP did not have a contract either with Platinum or with one of Platinum's subcontractors to furnish labor, materials or equipment for use in the performance of the contract.  Rather, as also shown on the face of the bond, CFP is listed as the "Owner" under the bond.

In Elm Haven Construction Ltd. Partnership v. Neri Construction, LLC, et al., 376 F.3d 96 (2d Cir. 2004) the owner asserted a claim under a Payment Bond. The District Court granted summary judgment to the Surety and the Second Circuit affirmed, noting that "Elm Haven [the Owner in that case] is not a 'claimant' within the meaning of the bond and was not assigned the rights of any claimant." The court proceeded to discuss the equitable subrogation argument asserted by the owner to justify its claim under the Payment Bond and found that argument to be "meritless."

This is further reinforced by Paragraph 2 of the Payment Bond, where the obligations to CFP as owner are spelled out. First and foremost, the obligation to the owner is to make payment for all sums due "claimants." The second obligation to the owner is to defend and hold harmless the owner from claims, demands, liens and suits presented by claimants. In connection with the latter, CFP as owner is required to promptly notify Utica Mutual of any such claim, demand, lien or suit. There is no allegation, nor can there be, that Utica Mutual has breached its obligation to CFP under the Payment Bond. Moreover, if there were any alleged breach by Utica Mutual of its obligations under the Payment Bond, such breach necessarily would involve payment allegedly due to a non-party claimant. In order to fully adjudicate any such alleged breach, the non-party claimant would need to be joined as a necessary party to this litigation. As there is no such allegation or evidence of any breach with respect to the Payment Bond as its relates to CFP, there is no claim that has ripened for adjudication before this court under the Payment Bond. As a result, CFP has no present claim under the Payment Bond to bring before this court and its suit insofar as it relates to the Payment Bond warrants dismissal as a matter of law.

## SUMMARY JUDGMENT IS APPROPRIATE

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." 120 Greenwich, 2004 U.S. Dist. LEXIS 10514, at *17-18 (citing Fed. R. Civ. P. 56(c)); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The moving party bears the burden of showing that there is no genuine issue of material fact and can satisfy this burden by demonstrating an "absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325.

In the Second Circuit, summary judgment is appropriate in contract disputes where the language of the contract is not ambiguous. Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1094 (2d Cir. 1993). The language of a contract is ambiguous if it is "'capable of more than one meaning when viewed objectively by a reasonably intelligent person.'" Id. at 1095 (quoting Walk-In Med. Ctrs. Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)).

CFP's correspondence to Platinum and Utica Mutual proves that CFP did not give pre-default notice, to either the Contractor or the Surety, as required under Paragraph 3.1 of the Performance Bond. By letter dated March 19, 2007, CFP informed Platinum that it was in default and terminated its services. (Ex. A at 2, ¶ 2; Ex. B ¶ 1). In its May 2, 2007 letter to Utica Mutual, CFP declared that Platinum was in default. In addition, CFP did not "request[] and attempt[] to arrange a conference with the Contractor and the Surety . . . to discuss methods of performing the Construction Contract." Moreover, CFP acted contrary to the default provisions of Paragraph 3 of the Performance Bond when it terminated Platinum's services without giving the Contractor or Surety an opportunity to cure.

Whether the provisions of Paragraph 3 create a condition precedent to the surety's obligations under the Performance Bond is a question of law. 120 Greenwich, 2004 U.S. Dist. LEXIS 10514, at *30 ("an unambiguous contract . . . may properly be resolved by summary judgment.") (quoting Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002); Natl. Fuel, 2003-258, slip op. at 14. Paragraph 3.1 of the Performance Bond expressly and clearly provides that pre-default notification be given to both the Contractor and the Surety and that the Owner request a meeting "to discuss methods of performing the Construction Contract" prior to declaring a Contractor default. It is beyond dispute that CFP failed to satisfy any of the conditions of Paragraph 3. Summary judgment in Utica Mutual's favor on the Performance Bond therefore is warranted.

It is equally clear that there is no present valid claim by CFP against Utica Mutual under the Payment Bond. Summary judgment in Utica Mutual's favor on the Payment Bond therefore likewise is warranted.

## CONCLUSION

In sum, CFP plainly failed to satisfy conditions precedent to Utica Mutual's obligations under its Performance Bond by ignoring the pre-default notification and other requirements clearly listed in Paragraph 3 of the Performance Bond. Moreover, CFP is not a "claimant" as defined in the Payment Bond, nor does CFP have any other present claim under the Payment Bond. For these reasons and the reasons more fully elaborated above, and in the other supporting papers, Utica Mutual respectfully requests that the Court issue an order granting Utica Mutual's motion for summary judgment and dismissing CFP's counterclaim against Utica Mutual.

Dated: New York, New York
      October 24, 2007

               Respectfully submitted,

               MOUND COTTON WOLLAN & GREENGRASS

               By: _____
                   John Mezzacappa
               Attorney for Additional Defendant on the Counterclaim
               Utica Mutual Insurance Co.
               One Battery Park Plaza
               New York, New York 10004
               (212) 804-4200

To:

Thomas G. De Luca (TDL 6312)
Attorneys for Defendant - Counterclaimant
CFP Group, Inc.
11 Commerce Drive
Cranford, New Jersey 07016
Telephone (908) 931-1100
Facsimile (908) 272-2670

     -and-

Lori Vaughn Ebersohl
LORI VAUGHN EBERSOHL, PLLC
252 North Washington Street
Falls Church, VA 2204
Telephone (703) 534- 4440
Facsimile (703) 534-4450

Paul G. Ryan (PR-2374)
WELBY, BRADY & GREENBLATT, LLP
Attorneys for Plaintiff
Platinum Mechanical, LLC
11 Matrine Avenue
White Plains, New York 10606
Telephone (914) 428-2100
Facsimile (914) 428-2172

# APPENDIX "1"

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 10514    Page 21 of 37

Case 1:07-cv-01083-RJS    Document 20    Filed 10/24/2007    Page 1 of 16

**LexisNexis®** *Total Research System*

Switch Client ┆ Preferences ┆ Sign Off ┆ [?] Help

Search ╲ Research Tasks ╲ Get a Document ╲ Shepard's® ╲ Alerts ╲ Total Litigator ╲    ·    Dossier ┆ History ┆ 🖨

Service: **Get by LEXSEE®**
Citation: **2004 us dist lexis 10514**

*2004 U.S. Dist. LEXIS 10514, \**

⬇ View Available Briefs and Other Documents Related to this Case

### 120 GREENWICH DEVELOPMENT ASSOCIATES, LLC, Plaintiff, - against - RELIANCE INSURANCE COMPANY, Defendant.

#### 01 Civ. 8219 (PKL)

#### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

#### 2004 U.S. Dist. LEXIS 10514

June 7, 2004, Decided
June 8, 2004, Filed

**DISPOSITION:** **[\*1]** Defendant's motion for summary judgment granted and action dismissed in its entirety.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff obligee, the owner of a renovation property, sued defendant surety seeking to recover damages under a performance bond it had issued on behalf of the renovation contractor. The surety moved for summary judgment on multiple grounds, including that the obligee failed to comply with the notice requirements that would trigger the surety's obligations under the bond.

**OVERVIEW:** The obligee became dissatisfied with the contractor's performance on the renovation job. Those parties entered into further negotiations, the result of which included disputed issues of fact, but at least potential draft agreements were not disclosed to the surety. Eventually the obligee sued on the bond, asserting the contractor failed to perform the contract in multiple respects, including abandoning the job. The surety asserted defenses of waiver by the obligee by releasing the contractor, untimely filing of the suit, impossibility of performance, modification of the construction contract, and failure to give notice. While most of the defenses left material factual issues unresolved, the court found that the notice provisions of the bond constituted conditions precedent to the surety's obligations as a matter of law, and the obligee had breached the suretyship agreement by failing to comply with the requirement that it notify the contractor and the surety that it was considering declaring a default, formally declare a contractor default and terminate the contractor's performance, and paying the balance of the contract price to the surety.

**OUTCOME:** The motion for summary judgment for failure to comply with the notice provisions was granted.

**CORE TERMS:** contractor, surety's, construction contract, default, summary judgment, conditions precedent, genuine issues, material fact, modification agreement, obligee,

subcontractors, notice, escrow, ceased, general contractor, completion, cardinal, performance bond, failed to comply, suretyship, modification, forfeiture, arrange, moving party, impossibility, constructive, subcontract, personally, discharged, purported

**LEXISNEXIS® HEADNOTES**                                                                                    ⊟ **Hide**

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

**HN1** A moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law underlying a claim determines if a fact is material and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. When considering the motion, a judge's function is not himself to weigh the evidence and determine truth of the matter but to determine whether there is a genuine issue for trial. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule
Civil Procedure > Summary Judgment > Standards > Genuine Disputes

**HN2** In determining whether genuine issues of material fact exist for purposes of summary judgment, a court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. The movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim. Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. Conclusory allegations will not suffice to create a genuine issue. There must be more than a scintilla of evidence and more than some metaphysical doubt as to the material facts. A non-moving party cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation of conjecture. A genuine dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. More Like This Headnote

Contracts Law > Defenses > Ambiguity & Mistake > General Overview
Contracts Law > Formation > Ambiguity & Mistake > General Overview
Contracts Law > Types of Contracts > Express Contracts

**HN3** Waiver, the intentional relinquishment of a known right, may be accomplished by express agreement, or by such conduct or failure to act as to evince an intent not to claim the purported advantage. In addition, it must be clear, unmistakable and without ambiguity. More Like This Headnote

Contracts Law > Performance > Impossibility of Performance > General Overview
Contracts Law > Performance > Tender & Delivery
Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > Excuse From Performance

**HN4** A party who actively interferes with the performance of a contract may not then recover damages or benefits by its own actions. If impossibility of performance arises directly or even indirectly from the acts of the promisee, it is a sufficient excuse for nonperformance.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Breach > Causes of Action > General Overview
Contracts Law > Types of Contracts > Guaranty Contracts
**HN5** Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted the surety under a performance bond constitutes a material breach, which renders the bond null and void.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Remedies > Bonds > Sureties > Procedures
Contracts Law > Performance > Discharges & Terminations
Contracts Law > Types of Contracts > Guaranty Contracts
**HN6** Under New York law, the general rule is that, absent the surety's consent or an express reservation of rights by the obligee, the obligee's release of the principal discharges the obligations of the surety. Unless a creditor reserves his rights against the surety, or the surety consents, if two persons are liable for a debt, one as principal and the other as surety, a voluntary release by the creditor of the principal with knowledge of the suretyship relation between the debtors discharges the surety. A surety may also be discharged where the principal and the obligee have materially altered or effected a cardinal change to the terms of the underlying contract without the surety's consent.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Summary Judgment > Standards > General Overview
Contracts Law > Contract Conditions & Provisions > Conditions Precedent
Contracts Law > Contract Interpretation > General Overview
**HN7** The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Contract Interpretation > General Overview
Contracts Law > Types of Contracts > Guaranty Contracts
**HN8** Under New York law, the interpretation of a contract of suretyship is governed by the standards that govern the interpretation of contracts in general.  More Like This Headnote

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview
**HN9** Words and phrases are given their plain meaning, and ambiguous language is construed against the party that drafted it.  More Like This Headnote

Contracts Law > Types of Contracts > Guaranty Contracts
**HN10** Under New York law, a compensated corporate surety, as opposed to an uncompensated surety, is not a favorite of the law, and its contract of suretyship will be construed in a manner most favorable to a claimant. The liability of a surety, however, cannot be extended beyond the plain and explicit language of the bond.  More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Conditions Precedent
**HN11** A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 10511    Page 24 of 37

Case 1:07-cv-03318-PAC    Document 20    Filed 10/24/2007    Page 4 of 16

in the agreement arises.  More Like This Headnote

Contracts Law > Consideration > Enforcement of Promises > General Overview
Contracts Law > Contract Conditions & Provisions > General Overview

HN12⊕A condition is distinguishable from a promise, which is a manifestation of
intention to act or refrain from acting in a specified way, so made as to justify a
promisee in understanding that a commitment has been made. Conditions can be
express or implied. Express conditions are those agreed to and imposed by the
parties themselves. Implied or constructive conditions are those imposed by law
to do justice. Express conditions must be literally performed, whereas
constructive conditions, which ordinarily arise from language of promise, are
subject to the precept that substantial compliance is
sufficient.  More Like This Headnote

Contracts Law > Contract Conditions & Provisions > General Overview

HN13⊕In determining whether a particular term in an agreement is a condition or a
promise, courts generally interpret doubtful language as establishing a promise
or constructive condition. Nevertheless, where the language is clear, the policy
favoring freedom of contract requires that, within broad limits, the agreement of
the parties should be honored, even though forfeiture
results.  More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Forfeiture Clauses

HN14⊕The preference for finding a constructive condition or promise is stronger in cases
involving a risk of forfeiture. Forfeiture is defined as the denial of compensation
that results when the obligee loses its right to the agreed exchange after it has
relied substantially, as by preparation or performance, on the expectation of that
exchange. To the extent that the non-occurrence of a condition would cause
disproportionate forfeiture, a court may excuse the non-occurrence of that
condition unless its occurrence was a material part of the agreed
exchange.  More Like This Headnote

## ⊤Available Briefs and Other Documents Related to this Case:

U.S. District Court Motion(s)

**COUNSEL:** Frederick R. Rohn, Esq., Henry A. H. Rosenzweig, Esq., SACKS MONTGOMERY,
P.C., New York, NY, Attorneys for Plaintiff.

George F. Mackey, Esq., Christopher J. Sheehy, Esq., Christine A. Gormsen, Esq.,
WESTERMANN HAMILTON SHEEHY AYDELOTT & KEENAN, LLP, Garden City, NY, Attorneys for
Defendant.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINION BY:** Peter K. Leisure

## OPINION

## OPINION AND ORDER

## LEISURE, District Judge:

Plaintiff, 120 Greenwich Development Associates LLC ("120 Greenwich" or "plaintiff"), commenced this diversity action seeking to recover damages under a performance bond issued by defendant Reliance Insurance Company ("Reliance" or "defendant"). Defendant now moves for summary judgment dismissing this action on numerous grounds. Because the Court finds that plaintiff failed to comply with the notice requirements of the Bond, defendant's motion is granted.

## BACKGROUND

The factual background to this action is relatively straightforward, and, unless otherwise noted, undisputed. 120 Greenwich is a limited liability company organized under the laws of the state of New York with **[*2]** its principle place of business located at 120 Greenwich Street, New York, New York. In April 1998, 120 Greenwich, as owner, entered into a $ 7,422,077 construction contract ("Contract" or "Construction Contract") with Thomsen Construction Co., Inc. ("TCCI"), the contractor, to perform the work necessary for the rehabilitation and conversion of a warehouse located at 120 Greenwich Street into a residential space ("the Project"). TCCI, in turn, obtained a $ 7,422,077 performance bond ("Bond" or "Performance Bond") from Reliance, naming TCCI as principal and 120 Greenwich as obligee.

The Bond itself is a form document promulgated by the American Institute of Architects, identified as an AIA Document 312 Performance Bond ("AIA 312"). Under the Bond, "The Contractor [TCCI] and the Surety [Reliance], jointly and severally bind themselves . . . to the Owner [120 Greenwich] for the performance of the Construction Contract, which is incorporated herein by reference." (Aff. of Stephen S. Thomsen, sworn to on Oct. 12, 2002 ("Thomsen Aff."), Ex. B P1.) If there is no Owner default, Paragraph 3 of the Bond provides that,

the Surety's obligation under this Bond shall arise after:

3.1 **[*3]** The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

(Id. **[*4]** P3.)

Under Paragraph 4,

When the Owner has satisfied the conditions of Paragraph 3, the Surety shall

promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:  **[*5]**

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefore to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefore.

(Id. P4.)

The Bond further provides that if the surety does not proceed under Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default, and the Owner shall be entitled to pursue any remedies available to it. (Id. P5.) Likewise, if the Owner rejects the payment tendered by the Surety pursuant to Subparagraph 4.4 or if the Surety has denied liability, the Owner is entitled to pursue all available remedies. (Id.) However, "after the Owner has terminated the Contractor's right to complete the Construction Project, and if the Surety elects to act under Subparagraph 4.1, 4.2 or 4.3," the surety is liable for the responsibilities of the contractor under the Construction Contract, including the "correction of defective work and completion of the Construction Contract; additional legal, design and delay costs resulting from the Contractor's Default, and resulting from the actions **[*6]**  or failure to act of the Surety under Paragraph 4; and liquidated damages, or, if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor." (Id. P6.)

The Bond defines "Contractor Default" as "failure of the Contractor, which has neither been remedied or waived, to perform or otherwise comply with the terms of the Construction Contract" (Id. P12.3), and states that "any proceeding, legal or equitable, under this Bond . . . shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first." (Id. P9).

Shortly after entering into the Construction Contract, TCCI began its work on the Project. The parties agree that, in performing the Contract, TCCI did not directly engage in construction work, but rather arranged for subcontractors to perform virtually all of the actual construction. Thus, TCCI effectively played a supervisory role in the Project; overseeing and coordinating the efforts of the various subcontractors **[*7]**  and laborers who performed the physical work.

At this point, the parties' respective versions of the events leading up to this lawsuit diverge. In support of its motion, defendant submits the affidavit of Stephen S. Thomsen, the president of TCCI, and supporting documentation. In his affidavit Thomsen states that, prior to the spring of 1999, he personally provided much of the actual site supervision and coordination of the various subcontractors and laborers working on the Project. (Thomsen Aff. P4.) However, Thomsen further states that in March 1999 he approached Larry Devine, the principal of 120 Greenwich, and informed him that TCCI was experiencing financial difficulties in connection with other, unrelated, projects and that, although sufficient funds existed under the Construction Contract to complete the project, he did not believe that TCCI could continue operating. As a result, Thomsen states, he informed Devine that he planned to seek other employment. (Id. P6.)

According to Thomsen, he and Devine continued their discussions relating to TCCI's financial problems for several months, culminating in an agreement in June of 1999 that TCCI would cease performance under the **[*8]** Construction Contract and that 120 Greenwich would complete the Contract work. (Id. P7.) Although TCCI would no longer be involved in the Project under this agreement, Thomsen states that he committed to assist with the Project in his personal capacity as a consultant to 120 Greenwich. (Id.) Accordingly, on June 1, 1999, Thomsen states that he began full-time employment with a separate company and TCCI "ceased operating." (Id. P8.)

Defendant contends that under the new agreement 120 Greenwich took over TCCI's obligations under the Construction Contract, including managing the Project's subcontractors and supervising and paying TCCI's former employees. (Id. P8.) Reliance claims that this agreement was later memorialized in a written agreement, executed by Thomsen on behalf of himself and TCCI, and delivered to 120 Greenwich on or about September 1, 1999. (Id. P9 and Ex. C.) According to Thomsen's affidavit, however, Devine insisted that the modification agreement be kept secret and held in escrow by 120 Greenwich's counsel to prevent notice of the agreement from reaching 120 Greenwich's lender, its liability insurer or Reliance. (Id. P10.)

In support of its **[*9]** motion, Reliance has produced an unsigned copy of this alleged modification agreement. Paragraph 1 of the agreement, entitled "Amendment to Contract," provides, *inter alia,* that,

> 1.1 Contractor shall, subject to Contractor's continuing obligations below, be relieved of its obligations as general contractor under the project.

> 1.2 Owner shall (i) make all decisions with respect to the Contract that were formerly made by the Contractor; (ii) assume all of the administrative, financial, and operating responsibilities for completing the Project; and (iii) generally act as the general contractor in place of the Contractor.

> 1.3 Notwithstanding the above, Contractor shall remain the nominal Contractor under the Contract.

> . . .

> 1.5 Contractor hereby assigns to Owner and Owner agrees to assume from and after the date hereof, all of Contractor's right, title and interest in and to all subcontracts, change orders, purchase orders and contracts.

> 1.6 Provided all of the terms of this agreement have been complied with by Contractor, Owner assumes the following costs and obligations with respect to the Project: Approximately $ 60,000 due to Local 79 (Mason Tenders Union), and

approximately **[*10]** $ 11,600 less amounts paid by Barrington Development Corp. or by 120 Greenwich Development Associates, LLC, only to the extent that Stephen Thomsen is personally liable to pay these bills and $ 85,000 to Premier PEO Group only to the extent that Stephen Thomsen is personally liable to pay this bills [sic].

(Id., Ex. C P1.) The agreement further states that 120 Greenwich will directly pay all employees, subcontractors, suppliers and other vendors necessary to complete the Project. (Id. P1.4(i).)

The modification agreement also provides for Thomsen to remain involved in the Project as a construction consultant for a fee of $ 100,000. (Id. P3.) In that capacity, the agreement obligates Thomsen to: (1) devote 5 hours a week to the Project under the supervision of the Owner; (2) attend lender "walk throughs" and assist with lender construction funding requisitions; (3) sign and obtain all documentation required by the Owner and necessary to complete the Project; (4) keep insurance policies identified by Owner in effect, "it being understood that Owner will defer the cost of said policies;" (5) cooperate with the owner regarding the removal of mechanic's liens filed **[*11]** against the Project; (6) maintain the Bond initially issued for the Project; and (7) provide "'approval for payment' signatures" for payments to be made directly by the Owner for Project work, including the cosigning of checks and/or signing of letters indicating approval of such payments. (Id. P1.) Finally, the modification agreement provides for a release of TCCI and Thomsen from claims relating to the Project upon conclusion of their responsibilities under the modified agreement. (Id. P6.1.) Consistent with Thomsen's affidavit, the modified agreement also forbids TCCI and Thomsen from disclosing "any information whatsoever regarding the terms of the agreement." (Id. P7.2(c).)

Plaintiff, not surprisingly, tells a different story based primarily on an affidavit by Devine and supporting documentation. Devine states that in March of 1999, Thomsen informed him that TCCI was experiencing cash flow problems and might have to cease work on the Project. (Aff. of Lawrence I. Devine, sworn to on Dec. 20, 2002 ("Devine Aff.") P7.) According to Devine, however, 120 Greenwich did not agree to take over TCCI's responsibilities under the Construction Contract, but, in order to address **[*12]** TCCI's cash flow problems, agreed to: "(a) fund a [TCCI]/120 Greenwich joint bank account from which subcontractors and suppliers would be paid directly, (b) fund a [TCCI] payroll account from which [TCCI] employees for the Project would be paid directly and (c) fund payments totaling $ 100,000 for Thomsen's individual time and effort on the Project." (Devine Aff. P9.) He further states that Thomsen, whom Devine claims had little personal involvement with the Project prior to March 1999, in turn agreed to spend more time personally supervising the Project, maintain TCCI's insurance policies at TCCI's expense and continue to employ a site supervisor for the Project. (Id.)

Thereafter, 120 Greenwich contends that, despite these "funding arrangements," TCCI remained as the contractor for the Project; Thomsen was not hired as a construction consultant and 120 Greenwich did not take assignment of TCCI's subcontracts. (Id. P10.) Rather, 120 Greenwich takes the position that TCCI continued to perform its duties under the Construction Contract, including the employment of an on-site supervisor and overseeing the subcontractors working on the Project throughout 1999 and 2000. **[*13]** (Id. PP12-20.)

As for the September 1999 modification agreement produced by TCCI, 120 Greenwich states that this document is a draft agreement that 120 Greenwich did not agree to or sign. (Id. P22.) According to 120 Greenwich, no modification agreement was finalized until January 2000, at which point the parties agreed to a conditional release of TCCI. (Id. P23.) 120 Greenwich claims that it agreed to modify TCCI's obligations under the Construction Contract only after Thomsen threatened to withhold certain signatures necessary for the completion of the Project, that the agreement was placed in escrow, and that the parties agreed that it

would not become effective until the Project was sold or refinanced. (Id. PP21-23.)

In support of its opposition, 120 Greenwich has produced an unsigned copy of the purported January 2000 modification agreement and the corresponding escrow agreement. The January 2000 modification agreement is largely identical to the alleged September 2000 modification; however, paragraph 4, labeled "Solvency," contains the following additional provisions,

> It is a condition of Owner's obligation to pay the Consulting Fee and to release Contractor **[*14]** and Principal (as hereinafter set forth) . . . (ii) that all sums (after deducting Contractor's Profit and General Conditions which are each in amounts not greater than those listed for Contractor's Profit and General Conditions in the Project's loan documents) previously paid to Contractor under the Contract were actually paid to Contractor's materialmen, subcontractors, vendors and suppliers for the project and (iii) there has been no fraud or misapplication by Contractor of funds which were paid to Contractor by Owner for construction work at the Project.

(Id., Ex. P, Modification Agreement P4.) The escrow agreement provides,

> The Amendment will be held in escrow by Escrow Agent and shall neither be effective or released to any party unless and until (i) the Escrow Agent is in receipt of an original letter executed by a party hereto stating that title to the building has transferred or the underlying first mortgage encumbering the building has been refinanced, and (ii) Escrow Agent has verified such transfer or refinance to its reasonable satisfaction, unless the other party has consented to the release of the Amendment.

(Id., Ex. P, Escrow Agreement **[*15]** P2.)

120 Greenwich claims, however, that in the spring of 2001 it discovered that TCCI had diverted significant funds from the Project for its own use. (Id. PP28-31.) As a result, in June of 2001, it sent a letter to TCCI, with a copy to Reliance, declaring TCCI in default of the Construction Contract and demanding more than $ 6.8 million in damages based on several alleged defaults by TCCI. In particular, the letter demands damages resulting from TCCI's alleged diversion of funds, financial distress, failure to complete the Project, delay, and failure to maintain liability insurance through the duration of the Project. Finally, the letter purports to rescind the modification agreement prior to its becoming effective. (Id., Ex. R.) Accordingly, in the view of 120 Greenwich, TCCI was never replaced as general contractor for the Project or released from its obligations under the Construction Contract, Thomsen was not engaged by 120 Greenwich as a construction consultant, 120 Greenwich did not take assignment of TCCI's subcontracts and 120 Greenwich did not assume responsibility for management of TCCI's employees.

On August 31, 2001, 120 Greenwich brought this action seeking **[*16]** damages under the Bond for TCCI's alleged breaches and defaults under the Construction Contract. Specifically, 120 Greenwich alleges that TCCI breached the Contract by: "diverting sums paid by 120 Greenwich to other uses besides the construction of the Project; failing to pay subcontractors, suppliers and workers; failing to proceed with construction in a timely manner; failing to provide sufficient resources for completion of the Project; failing to maintain required insurance; and abandoning the Project." (Compl. P7.) Reliance now moves for summary judgment dismissing 120 Greenwich's Complaint on the following grounds: (1) The action is untimely, having been brought more than two years after TCCI ceased working on the Project. (2) 120 Greenwich failed to comply with the various conditions required to trigger Reliance's obligations under the Bond. (3) 120 Greenwich waived whatever claims it had under the Bond by relieving TCCI from its obligations under the Construction Contract.

(4) By failing to give Reliance adequate notice of TCCI's alleged defaults, 120 Greenwich made it impossible for Reliance to perform its obligations under the Bond. (5) By modifying the Construction Contract **[*17]** to relieve TCCI of its duties thereunder, 120 Greenwich also relieved Reliance, whose obligations under the Bond are derivative of TCCI's obligations under the Contract. Finally, (6) TCCI's and 120 Greenwich's modification of the Contract constitutes a cardinal change to the Contract that discharged Reliance's obligations under the Bond.

With regard to arguments 1, 3, 4, 5, and 6 (time bar, waiver, impossibility of performance, discharge and cardinal change, respectively), the Court finds that there are genuine issues of material fact that preclude summary judgment. With respect to argument 2, however, the Court finds that the notice provisions of the Bond constitute conditions precedent to Reliance's obligations thereunder. Because 120 Greenwich failed to comply with these conditions, defendant's motion is granted.

## DISCUSSION

### I. The Standard for Summary Judgment

**HN1** A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) **[*18]** ; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Holt v. KMI-Continental Inc., 95 F.3d 123, 128 (2d Cir. 1996). The substantive law underlying a claim determines if a fact is material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). When considering the motion, "the judge's function is not himself to weigh the evidence and determine truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249; see also Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

**HN2** In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255; Holt, 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue **[*19]** of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1223-24 (2d Cir. 1994). "The movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. See Celotex, 477 U.S. at 324. "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" Delaware & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990) (quoting Anderson, 477 U.S. at 252, and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)). In other words, "the non-movant **[*20]** cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation of conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (quotations omitted). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Dister v. Cont'l Group, 859 F.2d 1108, 1114 (2d Cir. 1988) (citing Anderson, 477 U.S. at 248).

*II. Genuine Issues of Material Fact Preclude Summary Judgment Based on Defendant's Time Bar, Waiver, Impossibility of Performance, Discharge and Cardinal Change Arguments*

## A. Time Bar

Reliance argues that this action is time barred because 120 Greenwich commenced this action on August 31, 2001, more than two years after TCCI ceased working on the Project. According to Reliance, TCCI's performance under the Construction Contract ceased in June of 1999 when 120 Greenwich and TCCI allegedly agreed that 120 Greenwich would take over TCCI's responsibilities under the Contract and that 120 Greenwich would remain **[*21]** on the Project only as the "nominal" general contractor. Because the Bond's contractual limitation provision bars actions commenced more than two years after the Contractor ceased working, 120 Greenwich contends this action should be dismissed.

While such limitation provisions are valid and enforceable under New York law, [1] see, e.g., Krugman and Fox Constr. Corp. v. Elite Assoc., Inc., 167 A.D.2d 514, 515, 562 N.Y.S.2d 188, 189-90 (2d Dep't 1990), there is a genuine issue of material fact as to whether TCCI ceased work on the Project more than two years before 120 Greenwich filed its complaint. Specifically, although Thomsen's description of the purported oral release of TCCI in June 1999 would support a finding that TCCI ceased working on the Project at that time, his account is contradicted by Devine's affidavit, which states that there was no oral modification of the Contract and that TCCI continued to perform its duties under the Contract through 1999 and 2000.

## FOOTNOTES

[1] The parties agree, as does the Court, that New York law applies.

**[*22]** In support of Devine's affidavit, 120 Greenwich has also submitted numerous documents signed or endorsed by TCCI, including cancelled checks, payroll account records, applications and certifications for payment for Contract work, lien releases from various subcontractors and other correspondence that could support a finding that 120 Greenwich continued to work on the Project subsequent to August 31, 1999. As Reliance correctly points out, these documents could also support a finding that TCCI remained involved in the Project in name only. The Court's function in deciding motions for summary judgment, however, is not to weigh the evidence and make findings of fact. Here, defendant has clearly raised a genuine issue of material fact as to when, and if, TCCI ceased working on the Project. Thus, summary judgment dismissing the action based on the limitation provision in the Bond is denied.

## B. Waiver

[HN3] Waiver, "the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage." Hadden v. Consol. Edison Co. of N. Y., 45 N.Y.2d 466, 469, 382 N.E.2d 1136, 1138, 410 N.Y.S.2d 274, 275-76 (1978) **[*23]** (citations omitted). In addition, it must "be clear, unmistakable and without ambiguity." Port Distrib. Corp. v. Pflaumer, 880 F. Supp. 204, 211 (1995). Reliance argues that 120 Greenwich waived its rights under the Bond when it learned of TCCI's inability to continue performance under the Contract in the spring of 1999 and, rather than complying with the terms of the Bond and calling on Reliance to step into TCCI's shoes, it unilaterally chose to take over TCCI's obligations under the Construction Contract.

There is clearly a wealth of support for this theory before the Court; however, according to

Devine's sworn statement, it was never clear that TCCI could no longer perform under the Contract and, furthermore, 120 Greenwich never took over TCCI's obligations under the Contract. Rather, Devine claims that 120 Greenwich merely agreed to provide TCCI with additional funding to address its cash flow needs. Reliance attempts to rebut Devine's affidavit with an additional affidavit by Thomsen, which states that Thomsen specifically informed Devine in March of 1999 that TCCI could no longer continue operating. (Reply Aff. of Stephen S. Thomsen of Feb. 14, 2003 ("Reply **[*24]** Thomsen Aff.") P6.) Thomsen's second affidavit also catalogues more specifically, and with documentary support, Devine's increased role in controlling the Project subsequent to March 1999. (Id. PP10-49.) [2] Nevertheless, Reliance's showing is insufficient to result in judgment as a matter of law on this question. Whether Thomsen informed Devine that TCCI could no longer operate and whether 120 Greenwich took over TCCI's duties as the general contractor under the Contract are questions for a jury. Thus, Devine's affidavit and supporting documentation are also sufficient to create a genuine issue of material fact as to whether 120 Greenwich waived its rights under the Bond.

## FOOTNOTES

[2] Thomsen's reply affidavit also states that after he informed Devine that TCCI could no longer continue to operate, Devine suggested that they work together to fabricate a default scenario and claim under the Bond that would result in a substantial windfall at Reliance's expense. Thomsen states that Devine offered to split the proceeds of this caper between the two of them and that it was only after Thomsen refused this offer that Devine agreed to consider other options. (Reply Aff. P7.) These are troubling allegations; however, there are, at present, no claims of insurance fraud before the Court and these claims do not effect the analysis of the instant motion.

## [*25] C. Impossibility of Performance

These same factual discrepancies preclude summary judgment based on defendant's argument that 120 Greenwich, by failing to notify Reliance that TCCI could no longer operate and taking over TCCI's responsibilities under the Contract, made it impossible for Reliance to perform under the Bond.

Reliance argues that 120 Greenwich's actions prevented it from investigating TCCI's alleged default and choosing between its options for performance under the Bond, including (1) arranging for TCCI, with 120 Greenwich's consent, to complete the Contract, (2) completing the Contract work itself, or through its agents, (3) obtaining bids from qualified contractors and arranging for a contract between such a contractor and 120 Greenwich, or (4) waiving its right to arrange for completion of the work and, after investigation, tendering payment to 120 Greenwich. It is well established that [HN4] "a party who actively interferes with the performance of a contract may not then recover damages or benefits by its own actions." Society of Survivors of the Riga Ghetto, Inc. v. Huttenbach, 141 Misc.2d 921, 927-28, 535 N.Y.S.2d 670, 675 (Sup. Ct. 1988) [*26] (citations omitted); see also Vandegrift v. Cowles Eng'g Co., 161 N.Y. 435, 443, 55 N.E. 941, 943 (1900) ("[If impossibility of performance] arises directly or even indirectly from the acts of the promisee, it is a sufficient excuse for nonperformance."). Relatedly, [HN5] "courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." St. Paul Fire and Marine Ins. Co. v. City of Green River, Wyo., 93 F. Supp. 2d 1170, 1178 (D. Wyo. 2000) (collecting cases). However, 120 Greenwich has raised a material issue of fact as to whether Thomsen informed Devine that TCCI could no longer operate and whether 120 Greenwich covertly took over TCCI's duties as general contractor thereby preventing Reliance from exercising its performance options under the Bond. Accordingly,

summary judgment based on this argument is unwarranted.

## D. Discharge and Cardinal Change

Similarly, Reliance's discharge and cardinal change arguments also rely on disputed factual issues. Reliance contends **[*27]** that the September 1999 modification agreement, which memorialized TCCI's and 120 Greenwich's earlier oral agreement, effectively discharged TCCI's obligations under the Construction Contract. Because Reliance's liability under the Bond is coterminous with TCCI's liability under the Construction Contract, Reliance argues that its obligations to 120 Greenwich also have been discharged. In addition, Reliance argues that the September 1999 modification agreement, by substituting 120 Greenwich for TCCI as the general contractor, materially altered the nature of the Construction Contract and the corresponding risks underwritten by Reliance. According to Reliance, this alteration constitutes a cardinal change to the Construction Contract that discharges its liability on the Bond.

*HN6*Under New York law, the general rule is that, absent the surety's consent or an express reservation of rights by the obligee, the obligee's release of the principal discharges the obligations of the surety. See Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir. 1999); Pro-Specialties, Inc. v. Thomas Funding Corp., 812 F.2d 797, 799 (2d Cir. 1987); **[*28]** Foreman v. Louis Jacques Constr. Co., 261 N.Y. 429, 437, 185 N.E. 690, 692 (1933); In re Liquidation of Union Indem. Ins. Co. of New York, 234 A.D.2d 120, 121-22, 651 N.Y.S.2d 436, 437 (1st Dep't 1996); Jones v. Gelles, 167 A.D.2d 636, 637, 562 N.Y.S.2d 992, 993 (3d Dep't 1990); see also 63 NY Jur. 2d, Guaranty and Suretyship § 255 (1987) ("Unless a creditor reserves his rights against the surety, or the surety consents, if two persons are liable for a debt, one as principal and the other as surety, a voluntary release by the creditor of the principal with knowledge of the suretyship relation between the debtors discharges the surety."). A surety may also be discharged where the principal and the obligee have materially altered or effected a "cardinal change" to the terms of the underlying contract without the surety's consent. See New York City School Constr. Auth. v. Koren-DiResta Constr. Co., Inc., 249 A.D.2d 205, 206, 671 N.Y.S.2d 738, 740 (1st Dep't 1998) ("It is well settled that a suretyship is a contractual relationship, and, accordingly, that the creditor and the principal debtor may not alter the surety's **[*29]** undertaking without the surety's consent."); In re Liquidation of Union Indem. Ins. Co. of New York, 220 A.D.2d 339, 340, 632 N.Y.S.2d 788, 789 (1st Dep't 1995); Aetna Cas. and Sur. Co. v. LFO Const. Corp., 207 A.D.2d 274, 276-77, 615 N.Y.S.2d 389, 391 (1st Dep't 1994); In re Liquidation of Union Indem. Ins. Co., 199 A.D.2d 209, 211, 605 N.Y.S.2d 756, 758 (1st Dep't 1993). Certainly, the substitution of the actual principal under a bond without the knowledge of the surety could effect such a change, see United States Fid. & Guar. Co. v. Braspetro Oil Services Co., 219 F. Supp. 2d 403, 480 (S.D.N.Y.), aff'd in part, rev'd in part, 369 F.3d 34, 2004 U.S. App. LEXIS 9897, Nos. 02-9185 & 02-9187, 2004 WL 1119583 (2d Cir. May 20, 2004); however, Devine's affidavit and the purported escrow agreement submitted by 120 Greenwich call into question whether the modifications alleged by Reliance ever took place and whether the release of TCCI ever took effect. Therefore, genuine issues of material fact as to whether and to what extent 120 Greenwich agreed to release TCCI from its obligations and/or substituted its own performance for that of TCCI under **[*30]** the Contract preclude the Court from determining whether these principals warrant summary judgment dismissing the complaint.

*III. 120 Greenwich Failed to Satisfy the Conditions Precedent Contained in Paragraph 3 of the Bond*

In contrast to the preceding arguments, which rest on contested versions of the facts in this case, Reliance's argument that the provisions in Paragraph 3 of the Bond are conditions precedent to its obligations under the Bond is a question of law for the Court to determine. See, e.g., Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002) *HN7*("The proper

interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."). Reliance argues that 120 Greenwich failed to comply with these conditions; therefore, Reliance's obligations under the Bond never matured and this action must be dismissed. 120 Greenwich does not contest the assertion that it failed to comply with the requirements of Paragraph 3. Instead, it argues that the provisions therein do not constitute conditions precedent and that they merely provide Reliance a defense to the extent it can **[*31]** show prejudice as a result of 120 Greenwich's failure to provide timely notice of TCCI's default.

*HN8* It is well established under New York law that "the interpretation of a contract of suretyship is governed by the standards which govern the interpretation of contracts in general." Int'l Fid. Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400, 405 (S.D.N.Y. 2000) (quoting General Phoenix Corp. v. Cabot, 300 N.Y. 87, 92, 89 N.E.2d 238 (1949)). Accordingly, the Court will "give effect to the intent of the parties as expressed in the clear language of the [bond]." United States Fid. and Guar., 219 F. Supp. 2d at 476. *HN9* "Words and phrases are given their plain meaning, and ambiguous language is construed against the party that drafted it." Id. Furthermore, *HN10* "under New York law, it is well established that a compensated corporate surety [as opposed to an uncompensated surety] is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to a claimant." Id. (quoting Cam-Ful Indus., Inc. v. Fid. and Deposit Co. of Md., 922 F.2d 156, 163 (2d Cir. 1991)). The liability of a **[*32]** surety, however, cannot be extended beyond the plain and explicit language of the bond. Int'l Fid. Ins. Co., 98 F.2d at 408; Mid-State Precast Sys. Inc. v. Corbetta Constr. Co. Inc., 202 A.D.2d 702, 706, 608 N.Y.S.2d 546, 550 (3d Dep't 1994); 63 N.Y. Jur. 2d, Guaranty and Suretyship § 89.

*HN11* "A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690, 660 N.E.2d 415, 418, 636 N.Y.S.2d 734, 737 (1995) (quoting Calamari and Perillo, Contracts § 11-2 (3d ed. 1987)); see also Merritt Hill Vineyards v. Windy Hgts. Vineyard, 61 N.Y.2d 106, 112-13, 460 N.E.2d 1077, 1081, 472 N.Y.S.2d 592, 596 (1984). *HN12* A condition is, of course, distinguishable from a promise, which is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Id. at 112, 460 N.E.2d at 1081, 472 N.Y.S.2d at 596 (quoting Restatement (Second) of Contracts § 2 **[*33]** ). Furthermore, "conditions can be express or implied. Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those 'imposed by law to do justice.' Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." Oppenheimer & Co., 86 N.Y.2d at 690, 660 N.E.2d at 418, 636 N.Y.S.2d at 737 (quoting Calamari and Perillo, Contracts § 11-8). *HN13* In determining whether a particular term in an agreement is a condition or a promise, courts generally interpret doubtful language as establishing a promise or constructive condition. Id. 86 N.Y.2d at 691, 660 N.E.2d at 418, 636 N.Y.S.2d at 737. Nevertheless, "where the language is clear, 'the policy favoring freedom of contract requires that, within broad limits, the agreement of the parties should be honored even though forfeiture results.'" Id. (quoting Restatement (Second) of Contracts § 227 cmnt. b). [3]

## FOOTNOTES

[3] *HN14* The preference for finding a constructive condition or promise is stronger in cases involving a risk of forfeiture. Forfeiture is defined as "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance, on the expectation of that exchange." Id. 86 N.Y.2d at 692, 660 N.E.2d at 419, 636 N.Y.S.2d at 738 (quoting Restatement

(Second) Contracts § 229 cmt. b). Moreover, "to the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement (Second) Contracts § 229. Plaintiff does not contend, however, that the risk of forfeiture is applicable to this case and the Court finds no basis in the record to apply the doctrine. Even if the doctrine applied, however, the Court's analysis set forth below would not change as the clear language of the Bond establishes that the requirements in Paragraph 3 are conditions precedent to Reliance's obligations.

[*34]  Here, Paragraph 3 of the Bond clearly states, "the Surety's obligation under this Bond shall arise after" the owner has taken the steps detailed in subparagraphs 3.1-3.3. Specifically, the owner must (1) notify the contractor and the surety that it is considering declaring a default and request a meeting with the contractor and the surety to attempt to resolve the problems with the contractor's performance; if the problems are not resolved the owner must then (2) formally declare a contractor default and terminate the contractor's right to complete the contract and (3) pay the balance of the contract price to the surety or to the contractor selected to complete the construction contract. This language creates unambiguous preconditions for triggering Reliance's obligations under the Bond that apply not just to the completion options in Paragraph 4, but also to its obligations for delay costs and other damages under Paragraph 6. United States Fid. and Guar., 219 F. Supp. 2d at 477 (holding that the actions required in Paragraph 3 of the AIA 312 bond "plainly constitute conditions precedent" under New York law); [4] Walter Concrete Constr. Corp. v. Lederle Laboratories, 99 N.Y.2d 603, 605, 788 N.E.2d 609, 610, 758 N.Y.S.2d 260, 261 (2003) [*35]  (finding that the AIA 311 form does not require notice of default as a condition precedent to a legal action on the bond, noting that "unlike the AIA-312 bond . . . an action on the AIA-311 bond is not tied to a declaration of default, the principal's cessation of work or the surety's refusal to perform under the bond" and "had the parties to the contract desired notice of default as a precursor to liability under the bond, they could have elected to issue the more specific AIA-312, which by its terms requires predefault notification to be given to the contractor and surety by the owner"); accord L & A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106, 110-11 (5th Cir. 1994) (holding that a clear declaration of default is a necessary precondition to invoking the surety's obligations where bond required surety to remedy principal's breach "whenever Principal shall be, and shall be declared by Obligee to be in default under the subcontract, the Obligee having performed the Obligee's obligations thereunder"); Enterprise Capital, Inc. v. San-Gra Corp., 284 F. Supp. 2d 166, 179 (D. Mass. 2003) ("This Court has concluded that the relevant [*36]  provisions were indeed conditions precedent. In support of this conclusion, the Court notes that other courts have consistently interpreted the language in this Performance Bond--'the Surety's obligation under this Bond shall arise after . . . '--to indicate the listing of conditions precedent."); AgGrow Oils, L.L.C. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 276 F. Supp. 2d 999, 1017 (D.N.D. 2003) (same); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, 986 F. Supp. 82, 86 (D. Conn. 1997) ("Performance bond requirements for notice of default and demand that the surety step in and perform under the bond must be met before an obligee can recover damages under the performance bond."); Bank of Brewton, Inc. v. Int'l Fid. Ins. Co., 827 So. 2d 747, 753 (Ala. 2002) (finding that the provisions in Paragraph 3 of the AIA 312 bond clearly constitute conditions precedent with which obligee must comply in order to trigger the surety's obligations). But cf. Int'l Fid., 98 F. Supp. 2d at 432-37 (holding, prior to United States Fidelity and Guaranty and Walter Concrete, that the provisions of Paragraph [*37]  3 of the AIA 312 bond did not establish conditions precedent to the surety's obligation to pay delay damages).

## FOOTNOTES

[4] On appeal, the Second Circuit adopted the district court's determination that the

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 10514
Case 1:07-cv-00018-JJF Document 20 Filed 10/24/2007 Page 36 of 37
Page 16 of 16

provisions of Paragraph 3 of the AIA 312 form constitute conditions precedent. <u>United States Fidelity and Guar., 219 F. Supp. 2d 403, 2004 WL 1119583 at *12</u>.

Having failed to comply with the conditions precedent to Reliance's obligations under the Bond, 120 Greenwich may not maintain the present action. Accordingly, the case must be dismissed.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED and this action is DISMISSED in its entirety. The Clerk is directed to close the case.

**SO ORDERED.**

New York, New York

June 7, 2004

Peter K. Leisure

U.S.D.J.

Service: **Get by LEXSEE®**
Citation: **2004 us dist lexis 10514**
View: Full
Date/Time: Wednesday, October 24, 2007 - 10:07 AM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
1 - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

TONI M. COCUZZO, being duly sworn, deposes and says:

That deponent is not a party to this action, is over the age of 18 years and located in New York, New York.

That on October 24, 2007, deponent served the within **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UTICA MUTUAL INSURANCE COMPANY'S MOTIONS FOR SUMMARY JUDGMENT** upon:

Thomas G. De Luca (TDL 6312)
Attorneys for Defendant - Counterclaimant
CFP Group, Inc.
11 Commerce Drive
Cranford, New Jersey 07016

        -and-

Lori Vaughn Ebersohl
LORI VAUGHN EBERSOHL, PLLC
252 North Washington Street
Falls Church, VA 2204

Paul G. Ryan (PR-2374)
WELBY, BRADY & GREENBLATT, LLP
Attorneys for Plaintiff
Platinum Mechanical, LLC
11 Matrine Avenue
White Plains, New York 10606

at the address designated by said attorney and/or party for that purpose, by depositing the same, enclosed in a postpaid, properly addressed envelope directed to said persons at the above address, in an official depository under the exclusive care and custody of United States Post Office.

TONI M. COCUZZO

Sworn to before me on
October 24, 2007

Notary Public

KEVIN J. BRASSIL
Notary Public, State of New York
No. 31-5018311
Qualified in New York County
Certificate Filed in New York County
Commission Expires Sept. 27, 20__